IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRITTNEY TYUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:15-CV-211-WKW |
| | ) | [WO] |
| VIRGINIA COLLEGE and | ) | |
| EDWARD DAVIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Brittney Tyus, a former nursing student, filed suit on March 31, 2015, against Defendants Virginia College, LLC, and Dr. Edward Davis, alleging that she had been the victim of sexual harassment in violation of Title IX of the Education Amendments of 1972. In lieu of an answer, Virginia College filed a motion to compel arbitration. Virginia College alleged that Ms. Tyus completed enrollment and tuition agreements incorporating arbitration provisions and stand-alone arbitration agreements when she enrolled in the school.[1] Virginia College

---

[1] Virginia College initially offered copies of two electronically signed enrollment and tuition agreements, each of which included an arbitration provision, and two stand-alone arbitration agreements as grounds for its motion to compel arbitration. As litigation proceeded, Virginia College discovered a third set of agreements purportedly executed by Ms. Tyus. Virginia College asserts that Ms. Tyus completed the three enrollment and tuition agreements and the three stand-alone arbitration agreements during the course of three separate periods of enrollment with the school.

asserted that these agreements and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, require that Ms. Tyus's claims be submitted to binding arbitration.

Pursuant to the FAA, a written arbitration provision in a "contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a party is "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement," it may petition a federal district court "for an order directing that such arbitration proceed in the manner provided for in [the] agreement." *Id*. § 4. A party is entitled to a trial on whether an arbitration agreement exists, if the party seeking to avoid arbitration carries his or her burden of placing "the making of the agreement for arbitration . . . in issue." *Id*.

Here, Ms. Tyus created a genuine issue as to the making of the agreements to arbitrate by unequivocally denying that she executed the agreements and offering "some evidence . . . to substantiate [her] denial." *T & R Eners.* v. *Cont'l Grain Co.*, 613 F.2d 1272, 1278 (5th Cir. 1980)[2] (quoting *Almacenes Fernandez v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)). Specifically, Ms. Tyus asserted that, during each of her enrollment meetings, she sat across the desk from the

_____

[2] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Enrollment Specialists as they executed the various enrollment agreements on their computers.   Ms. Tyus alleged that the Enrollment Specialists completed the documents without her knowledge or consent.   In addition to her affidavit detailing her recollection of the enrollment meetings, Ms. Tyus offered as evidence the affidavit of a fellow nursing student who similarly described a one-sided enrollment process, whereby a different Enrollment Specialist completed the online process without the student's knowledge as to the agreements being executed.  (Doc. # 8, Ex. B.)

Because Ms. Tyus carried her burden by placing the existence of the arbitration agreements into issue, the action proceeded to a bench trial on whether a binding arbitration agreement exists as required under § 2 and whether Ms. Tyus assented to binding arbitration under Alabama law.   During trial, it was the burden of Virginia College to prove the existence of an agreement to arbitrate by a preponderance of the evidence.   This opinion constitutes the court's findings of fact and conclusions of law.

## I.     JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1331.   Personal jurisdiction and venue are uncontested.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard the evidence and considered the arguments of counsel and the relevant law, the court makes the following findings of fact and conclusions of law.

### A.    **Findings of Fact**

Ms. Tyus and Virginia College's relationship began on May 20, 2013, when she accessed the Virginia College website from a computer in Crossville, Tennessee, and created an account.[3]  To begin the process, Ms. Tyus first selected whether she was interested in exploring Virginia College's online educational opportunities or an on-campus experience.  After making her selection, Ms. Tyus was directed to the "Create a New Account" page of Virginia College's Student Enrollment Portal, at which point she entered her name, email address, and phone number, created a password, and hit "Register."  (Doc. # 28, at Ex. 6.)

Ms. Tyus was then provided instructions for verifying her new account.  Following these instructions, Ms. Tyus went to her personal email account and accessed an "account verification email" sent by Virginia College.  By clicking on a link in the body of the email, Ms. Tyus verified her new account and was permitted to log back into the Student Enrollment Portal and continue the enrollment process by creating a profile.

---

[3] Virginia College's online platform maintains a running log of all activity initiated with regard to a student's account.  The platform begins recording activity from the time a prospective student first registers an account.  In addition to documenting the date, time, and nature of the activity completed, the platform records the identity of the person undertaking the activity.

The "My Profile" page of Virginia College's Student Enrollment Portal provides a list of items that must be accomplished before a student is deemed "Ready for the Enrollment Process." (Doc. # 28, at Ex. 6.) The first task listed is described as an "Electronic Signature Consent." When Ms. Tyus clicked on this task, she was directed to a page consisting of a blank "Electronic Signature (E-Sign) Consent Form." The top of the page instructed Ms. Tyus to "review the following document" and informed her that she "must agree to the use of an electronic signature to use the enrollment portal."[4] (Doc. # 28, at Ex. 6.) The Electronic Consent Form includes the following language:

> By providing your consent, you are consenting to having the following transactions and records conducted and maintained in an electronic form:
>
> 1.    Application documents and contracts.
> 2.    Enrollment documents and contracts.
> 3.    Financial Planning documents and contract.

(Doc. # 28, at Ex. 6.) Ms. Tyus typed her name and the date at the bottom of the Electronic Consent Form and then clicked on a box, evidencing her understanding and assent to the form's terms.

Though Ms. Tyus testified during the trial that she either did not complete the Electronic Consent Form or that she did not remember completing the

---

[4] While the legal effect of an electronic signature has not been contested by Ms. Tyus, the court notes that Alabama has enacted the Uniform Electronic Transactions Act, a provision of which states that, "[i]f a law requires a signature, an electronic signature satisfies the law," Ala. Code § 8-1A-7, as long as both parties to the transaction "agreed to conduct transactions by electronic means." § 8-1A-5(b).

Electronic Consent Form, the evidence establishes that the Electronic Consent Form and the other tasks listed on the Enrollment Portal's "My Profile" page were all completed from a computer on the military base in Crossville, Tennessee, on May 20, 2013.  Ms. Tyus's testimony establishes that she was stationed at the military base located in Crossville, Tennessee, at that time, and that she used a computer on the military base to create her account and begin the enrollment process on May 20, 2013.  Accordingly, the court finds that Ms. Tyus did complete the Electronic Consent Form and merely fails to remember that she did so, as any alternative theory of events proves untenable.

After completing the various tasks required to create a profile, Ms. Tyus logged out of the Virginia College Student Enrollment Portal, and the school began taking action to continue Ms. Tyus's enrollment.  For example, Virginia College assigned her an Enrollment Specialist, Ms. Juanita Patrick, who began emailing Ms. Tyus to set up a time for an in-person enrollment meeting. Similarly, a different Virginia College employee began uploading Ms. Tyus's military documentation.

On June 26, 2013, Ms. Tyus had her first in-person enrollment meeting with Ms. Patrick.  Ms. Tyus testified that, during her time on campus, Ms. Patrick provided her with information about the nursing program and took her on a tour of the facilities.  Ms. Tyus did not remember completing enrollment documents and

suggested that it would have been unnecessary for her to complete enrollment documents at that time because she was not going to be able to attend classes until a later quarter.  In addition, Ms. Tyus firmly testified that she did not execute any arbitration agreements during this initial enrollment meeting.

The court, however, credits the testimony of Ms. Patrick who spoke in greater detail and clarity as to the specific events that occurred during Ms. Tyus's June 26, 2013 visit.  Specifically, she testified that Ms. Tyus's brother accompanied her during a portion of this initial meeting and that Ms. Tyus completed certain steps in the enrollment process that day prior to realizing that she would be unable to begin her studies until she retook one of her entrance exams.  Moreover, Ms. Patrick's testimony is corroborated by the June 26, 2013 entries of the student activity history log.  The log shows that Ms. Tyus logged into her student account using the password created in Crossville, Tennessee, and over the course of several minutes added and saved several enrollment documents to her account, including a tuition agreement and arbitration policy.

Due to Ms. Tyus's testing needs, however, the enrollment process was not completed on June 26, 2013, and Ms. Tyus restarted the process on September 17, 2013, when she met Ms. Patrick for a second enrollment meeting.  During the second enrollment meeting, Ms. Tyus again executed various enrollment documents and saved them to her student account, including an arbitration policy

and an enrollment and tuition agreement.  After completing all the necessary enrollment documents, Ms. Tyus then attended a meeting with a member of Virginia College's financial team to develop a personal funding plan that took into account the various funding sources available to her, including a scholarship provided through the Post 9/11 GI Bill.

By October 2013, Ms. Tyus had acquired and submitted all the necessary enrollment and financial documentation, had begun making personal tuition payments to Virginia College to supplement her outside funding sources, and had begun taking classes.  Ms. Tyus's academic transcripts reveal that she took three classes each academic quarter until the fall of 2014, making payments and checking grades on her student portal throughout that time.

On September 12, 2014, Ms. Tyus attended a third enrollment meeting so that she could continue her nursing courses during the upcoming academic terms.[5] While Ms. Tyus maintains that she did not execute any agreement during this enrollment meeting either, updated enrollment documents, including a new enrollment and tuition agreement and a new arbitration policy, were added to her student account.  Ms. Tyus then continued to make payments to Virginia College and attend classes for another three academic terms.  Ms. Tyus ultimately voluntarily withdrew from Virginia College in June 2015, approximately two

---

[5] Ms. Tyus's Enrollment Specialist for her September 2014 enrollment with Virginia College was Andrew Hill.

months after filing this action and one month after Virginia College moved to compel arbitration of her claims.

**B.    <u>Conclusions of Law</u>**

Upon consideration of the facts, arrived at with the benefit of jointly submitted exhibits, trial testimony, and the arguments of counsel, the court finds that Ms. Tyus executed enrollment and tuition agreements containing arbitration provisions and stand-alone arbitration agreements.  While this conclusion of law is sufficient to require Ms. Tyus to submit her claims to arbitration, the court will also discuss why, pursuant to Alabama law, arbitration is required even if the court had fully credited Ms. Tyus's version of events.

While Virginia College is seeking to compel arbitration pursuant to the FAA, state law generally governs whether an enforceable contract or agreement to arbitrate exists.  *See Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.").  Thus, in determining whether a binding arbitration agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts.  Applying Alabama law to the present action, it is clear that, even if the court were to credit Ms. Tyus's testimony that she did not electronically sign the enrollment and tuition agreements or stand-alone

arbitration agreements during any of her enrollment meetings, Ms. Tyus manifested her assent to the agreements by attending classes, re-enrolling, and paying tuition over the course of multiple academic semesters.

In a published opinion issued less than two months ago, the Alabama Supreme Court provided clear guidance on the ability of a party to assent to arbitration through actions manifesting ratification. *Am. Bankers Ins. Co. of Fla. v. Tellis*, No. 1131244, 2015 WL 3935260 (Ala. 2015.)   In *Tellis*, five homeowners filed suits against an insurer alleging breach of contract, fraud, unjust enrichment, and negligence theories. *Id.* at *1.  The insurer responded in each case with a motion to compel arbitration, which the plaintiffs opposed in part on the ground that "they had not signed any documents containing arbitration provisions." *Id.*  While the insurer produced unsigned arbitration forms, which it contended were normally incorporated as part of its insurance policies, the plaintiffs "executed affidavits swearing that they never received or signed either form—or any other document related to their [insurance] policies purporting to be an arbitration provision when applying for insurance or at anytime thereafter until the commencement of [the] litigation." *Id.* at *3.

When the various trial courts denied the insurer's motions to compel arbitration, the cases were appealed, and the Supreme Court of Alabama consolidated the actions. *Id.* at *1.  On appeal, the insurer conceded that the

plaintiffs had not signed arbitration agreements, but nonetheless argued that Alabama case law supported the principle that "an arbitration provision in an insurance policy can be effective even without the insured's signature." *Id*. at *3. The insurer cited *Southern United Fire Insurance Co. v. Howard*, 775 So. 2d 156 (Ala. 2000).

In *Howard*, a plaintiff had filed suit against his insurer, the insurer's management company, and the company that managed the collection of premiums on behalf of the insurer, alleging that the companies had misappropriated and negligently caused his automobile insurance coverage to be wrongfully cancelled. *Id*. at 160. The defendants each responded with a motion to compel arbitration on the basis of an arbitration provision included in the plaintiff's policy. *Id*. The trial court denied the motions, determining that the plaintiff had called into question whether a contract to arbitrate was formed by denying that he ever received a copy of the policy. *Id*.

On appeal, the defendants argued that the plaintiff had "agreed to the arbitration provision by, among other things, paying monthly premiums, renewing the policy, and submitting a claim under the policy." *Id*. at 161. The Alabama Supreme Court agreed with the reasoning of the defendants, concluding that, by paying premiums, renewing the policy, submitting a claim under the policy, and failing to cancel the policy, the plaintiff had "manifested [his] acceptance [of the

11

insured's] offer to insure his car under the terms in its policy, which included the arbitration provision." *Id*. Despite the fact that the arbitration provision did not appear in the insurance application and the plaintiff's contention that he did not sign or even remember receiving the insurance policy, the Alabama Supreme Court explained that

> Alabama's general contract law permits assent to be evidenced by means other than signature, and, thus, the contract of insurance and the arbitration provision contained in it can be enforceable by the parties in the absence of signatures, where the evidence establishes the existence of the agreement. . . . [The plaintiff] accepted and acted upon [the] insurance policy, which contained the arbitration provision, by paying premiums, renewing the policy, and submitting a claim under the policy. Therefore, because [the plaintiff] ratified the policy, the absence of his signature does not render the policy, or the arbitration provision contained in it, unenforceable.

*Id*. at 162–63.

After reviewing the precedent set by *Howard*, the Alabama Supreme Court in *Tellis* concluded that Alabama case law supported the defendant's position, namely that a party can manifest its "assent to arbitration by accepting and acting upon" an agreement containing an arbitration provision. 2015 WL 3935260, at *3. The Alabama Supreme Court further explained that, while it was uncertain "what parts of the insurance policy the policyholders acknowledged receiving," the Court had "enforced arbitration provisions in insurance policies where the plaintiffs claimed *never* to have received the written policies containing the provisions." *Id*. at *4 (alteration in original). Ultimately, the Alabama Supreme Court held that

> although the policyholders did not execute stand-alone arbitration agreements or necessarily even read or receive the insurance policies containing the arbitration provisions, they have nevertheless manifested their assent to those policies and, necessarily, the arbitration provisions in them, by accepting and acting upon the policies, inasmuch as they all affirmatively renewed their policies and paid their premiums, thus ratifying the policies.

*Id*. at *5.

Here, Ms. Tyus makes three primary[6] arguments as to why *Tellis* and *Howard* do not control the present action.  First, she argues that there exists a "vast transactional difference in context between a homeowner's insurance policy and an educational setting."  (Doc. # 30, at 1.)  Second, Ms. Tyus contends that her situation is factually different from the plaintiffs in *Tellis*, because while they only failed to receive the arbitration agreements, she never saw any agreement between herself and Virginia College.  Finally, Ms. Tyus asserts that Virginia College's actions amounted to fraud in that Virginia College failed to mention to her that an arbitration provision or agreement existed.  For the reasons provided below, each of these arguments is without merit under binding law.

---

[6] In her Response (Doc. # 30) to Virginia College's Notice of Supplemental Authority (Doc. # 21), Ms. Tyus also argued, for the first time, that her claims should not be compelled to arbitration because the arbitration provisions at issue are unconscionable.  Despite the fact that Virginia College argued against a finding of unconscionability in its Motion to Compel Arbitration (Doc. # 6) when it discussed court decisions that had found its arbitration provision valid and enforceable, Ms. Tyus chose not to combat or in any way address those arguments, instead exclusively challenging her assent to the agreements.  And while Ms. Tyus affirmed her unconscionability challenge orally during trial, she did so without offering any evidence or case law in support of her assertion.  Accordingly, Ms. Tyus has failed to timely plead or sufficiently argue unconscionability.

Ms. Tyus requests that this court cabin the reasoning employed by the Alabama Supreme Court in *Tellis* and *Howard* to the insurance realm, arguing that vast differences exist between Ms. Tyus's educational enrollment and an insurance transaction.  Ms. Tyus fails, however, to give weight to the Alabama Supreme Court's clear intent to avoid narrowing its decision to arbitration provisions in insurance agreements.  The Alabama Supreme Court specifically ventured outside the insurance arena, despite sufficient analogous case law, and explained that it had, "on other occasions, considered similar cases involving financial agreements other than insurance policies in which parties have challenged arbitration provisions they alleged were subsequently added to the agreements without their express consent or knowledge" and had "uniformly recognized that a signature or express consent is not required to give effect to the new arbitration provisions." *Tellis*, 2015 WL 3935260, at *4.  Moreover, while Ms. Tyus may not want to characterize her agreement as a financial transaction, three of the agreements at issue were entitled Enrollment and Tuition Agreements and obligated Ms. Tyus – or others on her behalf – to pay more than $50,000 to Virginia College – an obligation she does not dispute.  In sum, Ms. Tyus has not provided sufficient arguments to justify the conclusion that the Alabama Supreme Court would not reach a similar holding to those arrived at in *Howard* and *Tellis*.

14

As to the assertion that the present case is factually distinguishable from *Tellis* because Ms. Tyus "alleges that she was not even aware that a contract or agreement existed or was even necessary," the court highlights Ms. Tyus's own contradictory testimony.  For example, during trial, Ms. Tyus testified that she saw the top portion of the Enrollment and Tuition Agreement when she was asked by Ms. Patrick to confirm the accuracy of the initial information entered.  The top of the agreement reads, "Enrollment and Tuition Agreement."  (Doc. # 28, at Ex. B.) Further, Ms. Tyus confirmed that on at least one occasion prior to the filing of her lawsuit, she accessed the "My Documents" folder of her Student Enrollment Portal, at which time she would have seen a clearly titled list of each of the enrollment and financial agreements governing her relationship with Virginia College, including one titled "Arbitration Policy."  The platform allowed Ms. Tyus to click on any one of the documents to download a copy to her computer.  Further, as demonstrated by the Alabama Supreme Court in *Tellis*, Ms. Tyus was under a duty to investigate the agreements under which she was operating.  *See Tellis*, 2015 WL 3935260, at *4 (citing Alabama case law imposing a duty to investigate upon contracting parties).  Moreover, the Alabama Supreme Court went a step further in *Tellis* and noted that it had "also enforced arbitration provisions in insurance policies where the plaintiffs claimed *never* to have received the written policies containing the provisions."  *Id.*  (alteration in original).

15

Lastly, Ms. Tyus argues that, even if her conduct in continuing to attend school while possessing some limited knowledge of the enrollment agreements manifested assent, another reason exists to find that she did not ratify the agreements; she argues that the way in which Virginia College hurried her through the enrollment process without pointing out the existence of the arbitration provisions amounted to fraud.  Again, however, Alabama case law forecloses this argument.   In *Johnnie's Homes, Inc. v. Holt*, the Alabama Supreme Court explained that "[a] dealer is under no duty to disclose, or explain, an arbitration clause to a buyer."  790 So. 2d 956, 960 (Ala. 2001).  Despite the plaintiff's claim that he and his wife were illiterate and semi-illiterate, respectively, and that the defendant showed them only a single page while representing to them that the agreement was a "standard contract," the Alabama Supreme Court made clear that the defendant "owed no special duty to notify [the plaintiff] that the agreement contained an arbitration provision or to explain to him the substance of that provision."   *Id*.   Nevertheless, this court is troubled by the thin-as-tissue requirements for assent to arbitration provisions in Alabama, but Alabama law necessitates a determination that Ms. Tyus manifested her assent to the agreements by attending classes, paying tuition, and re-enrolling.

### III.  CONCLUSION

Based on the foregoing, Defendant Virginia College has proven by a preponderance of the evidence that Plaintiff Brittney Tyus assented to binding arbitration of her claims against Virginia College.  Accordingly, it is ORDERED that Plaintiff shall submit this dispute to arbitration in the manner provided in the applicable arbitration clause in accordance with 9 U.S.C. §§ 3–4.  It is further ORDERED that Ms. Tyus shall file a jointly prepared report regarding the status of the arbitration proceedings **on or before October 2, 2015**, and every ninety (90) days thereafter, until this matter is resolved.

It is further ORDERED that Virginia College's Motion for Reconsideration (Doc. # 21) is DENIED as moot.

DONE this 4th day of August, 2015.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE

17